**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff - Appellee*, v. JAMIE YAFA, *Defendant - Appellant*. | Nos. 23-4108 23-4330 <br> D.C. No. 3:21-cr-01310-WQH-3 <br><br> OPINION |
| UNITED STATES OF AMERICA, *Plaintiff - Appellee*, v. JOSHUA YAFA, *Defendant - Appellant*. | No. 23-4254 <br> D.C. No. 3:21-cr-01310-WQH-2 |

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted March 4, 2025
Pasadena, California

Filed May 15, 2025

Before: Mary H. Murguia, Chief Judge, and Gabriel P.
Sanchez and Holly A. Thomas, Circuit Judges.

Opinion by Chief Judge Murguia

## SUMMARY[*]

### Criminal Law

In codefendant brothers Joshua and Jamie Yafa's appeals
from their convictions and sentences for securities fraud and
conspiracy to commit securities fraud for their involvement
in a "pump-and-dump" stock manipulation scheme, the
panel affirmed the district court's reliance on Application
Note 3(B) in the commentary to United States Sentencing
Guidelines § 2B1.1, which, at the time the Yafas were
sentenced, instructed courts to use the gain that resulted from
the defendant's offense as an alternative measure for
calculating loss where loss cannot reasonably be determined.

Applying the analysis set forth in *Kisor v. Wilkie*, 588
U.S. 558 (2019), to determine whether deference to the
commentary's interpretation of a Guideline is appropriate,
the panel held (1) the term "loss" is genuinely ambiguous,
(2) Application Note 3(B)'s instruction to use gain is a
reasonable interpretation of "loss," and (3) the character and

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

context of Application Note 3(B) entitles it to controlling weight.

The panel concluded accordingly that Application Note 3(B)'s interpretation of "loss" warrants deference, and that the district court did not err when it used the gain that resulted from the Yafas's offenses as an alternative measure for loss.

In a concurrently filed memorandum disposition, the panel resolved the Yafas's additional challenges to their convictions and sentences.

## COUNSEL

Daniel E. Zipp (argued), Assistant United States Attorney, Chief, Appellate Section, Criminal Division; George Manahan, Attorney; Tara K. McGrath, United States Attorney; Andrew R. Haden, Acting United States Attorney for the Southern District of California; United States Attorney's Office, United States Department of Justice, San Diego, California; Aaron P. Arnzen, Bottini & Bottini, Inc., La Jolla, California; for Plaintiff-Appellee.

Marc Fernich (argued), Law Office of Marc Fernich, New York, New York; Marc S. Nurik, Law Offices of Marc S. Nurik, Los Angeles, California; Jason L. Liang, Liang Ly LLP, Los Angeles, California; for Defendant-Appellant.

# OPINION

MURGUIA, Chief Circuit Judge:

Following a jury trial, codefendants and brothers Joshua and Jamie Yafa (the "Yafas") were convicted of one count each of securities fraud and conspiracy to commit securities fraud for their involvement in a "pump-and-dump" stock manipulation scheme. At sentencing, the district court relied on Application Note 3(B) in the commentary to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1, which instructs courts to use the gain that resulted from the defendant's offense as an alternative measure for calculating loss where loss cannot reasonably be determined. U.S.S.G. § 2B1.1 cmt. n.3(B).[1] On appeal, the Yafas contend that it was legal error to defer to § 2B1.1's commentary because the term "loss" is not genuinely ambiguous. Because we hold that deference is appropriate, we conclude that the district court did not err when it relied on the commentary and used "gain" as an alternative measure for the "loss" attributable to the Yafas.[2]

I

In 2019, Charles Strongo acquired Global Wholehealth Products Corporation ("GWHP"), a struggling medical

---

[1] The United States Sentencing Commission recently amended the relevant Guidelines provision and commentary. Because the Yafas were sentenced before these revisions became effective, the parties agree the revisions do not apply to this case. Accordingly, all citations to the Guidelines and commentary in this opinion are to the versions in effect prior to the recent amendments, unless otherwise specified.

[2] In a concurrently filed memorandum disposition, we resolve the Yafas's additional challenges to their convictions and sentences.

manufacturing company. Later that year, Strongo partnered with Brian Volmer, who began raising funds for the company through outside investors and introduced Strongo to the Yafas, two brothers who worked as stock promoters. Because GWHP purported to manufacture medical test kits, the associates saw an opportunity to make a significant amount of money from the company's stock when the COVID-19 pandemic struck in March 2020.

Strongo, Volmer, and the Yafas proceeded to engage in a "pump-and-dump" stock manipulation scheme. First, the "pump." Having gained substantial control over GWHP's freely tradable stock, Strongo worked with Volmer and Joshua Yafa to increase the number of GWHP shares that were trading on the open market to legitimize the stock in the eyes of potential investors. The Yafas then promoted the stock using a "phone room," where operators called potential investors to push GWHP stock, and various forms of social media including email blasts and newsletters.

Second, the "dump." When GWHP stock had risen in price from fifty cents to two dollars per share, the scheme participants began gradually selling their shares. By March 2021, the Yafas and entities they controlled had sold enough GWHP shares to collectively earn over $1 million. Following the "dump," the price of GWHP stock declined significantly. Individual investors who acquired GWHP stock while the price was artificially inflated lost their investments. A grand jury subsequently indicted Strongo, Volmer, and the Yafas for their roles in the scheme. Strongo and Volmer pled guilty and testified against the Yafas at their 2023 trial, where the jury found the Yafas guilty of one count each of securities fraud and conspiracy to commit securities fraud.

At sentencing, the district court applied U.S.S.G. § 2B1.1(b)(1), which increases a defendant's offense level depending on the amount of "loss" resulting from the fraud committed. The Guidelines do not define "loss," but at the time the Yafas were sentenced, Application Note 3(B) in the commentary to § 2B1.1 instructed courts to "use the gain that resulted from the offense as an alternative measure of loss" where loss "reasonably cannot be determined."[3]

The district court found that the "full amount of investor losses would be exceedingly difficult to calculate," and therefore relied on "gain as a proxy for a portion of the total loss" attributable to the Yafas's criminal activities pursuant to Application Note 3(B). Relying on evidence from trial, the district court combined the gains attributable to each brother with the actual loss established by the Government to arrive at total loss amounts of $942,099.70 for Joshua, and $607,696.70 for Jamie. Based on the graduated table in U.S.S.G. § 2B1.1(b)(1), the district court therefore applied a fourteen-level increase to each brother's offense level.

After the fourteen-level enhancements were applied, Joshua's adjusted offense level was twenty-one and Jamie's was nineteen, resulting in a guideline range of thirty-seven to forty-six months for Joshua and thirty to thirty-seven months for Jamie. The district court then varied downward from the brothers' Guideline ranges and sentenced Joshua to thirty-two months of imprisonment and Jamie to seventeen months. The Yafas timely appealed.

---

[3] On November 1, 2024, amendments to the Guidelines became effective, moving this commentary on "gain" into the text of § 2B1.1 itself. *See* U.S.S.G. § 2B1.1(b)(1)(B) (Nov. 2024).

## II

We have jurisdiction pursuant to 28 U.S.C. § 1291 and review the Yafas's challenge to the district court's interpretation of U.S.S.G. § 2B1.1 de novo. *United States v. Castillo*, 69 F.4th 648, 652 (9th Cir. 2023).

## III

Because the Yafas were sentenced before Application Note 3(B) was moved from the commentary to the Guidelines, we must determine whether the district court's reliance on the commentary was appropriate. To determine whether it is appropriate to defer to the commentary's interpretation of a Guideline, we apply the analysis set forth in *Kisor v. Wilkie*, 588 U.S. 558 (2019). *Castillo*, 69 F.4th at 655–56.[4] *Kisor* instructs that courts owe deference to an agency's interpretation of its own rules where (1) the regulation is "genuinely ambiguous," (2) the interpretation is "reasonable," and (3) the interpretation is entitled to "controlling weight." 588 U.S. at 574–79. Section 2B1.1's commentary instructing courts to use gain as an alternative measure of loss satisfies these requirements.

## A

First, the term "loss" is genuinely ambiguous. A court may only conclude that a regulation is genuinely ambiguous after "exhaust[ing] all the traditional tools of construction." *Id.* at 575 (internal quotation marks omitted). In other words, it must consider "the text, structure, history, and

---

[4] The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), overruling *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "did not call *Kisor* into question . . . , so we continue to apply it." *United States v. Trumbull*, 114 F.4th 1114, 1118 n.2 (9th Cir. 2024).

purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Id.* Although "[w]e have not previously held that the term 'loss' under § 2B1.1 is genuinely ambiguous," *United States v. Hackett*, 123 F.4th 1005, 1012 (9th Cir. 2024), several of our sister circuits have reached this conclusion applying *Kisor*. *See, e.g.*, *United States v. You*, 74 F.4th 378, 397–98 (6th Cir. 2023) (holding that "loss" is genuinely ambiguous); *United States v. Boler*, 115 F.4th 316, 328–29 (4th Cir. 2024) (same). *But see United States v. Banks*, 55 F.4th 246, 257–58 (3d Cir. 2022) (holding that the ordinary meaning of "loss" controls).

Beginning with the text of § 2B1.1, dictionaries support "no one definition" of the term "loss" but rather demonstrate that it "can mean different things in different contexts." *You*, 74 F.4th at 397; *see United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) ("[A] review of dictionaries reveals that 'loss' can have a range of meanings . . . ."). In the economic context, for example, a reasonable person might define "loss" narrowly as an "amount lost" whereas another may use the term to express more broadly the entire "detriment or disadvantage involved in being deprived of something." *Loss*, OXFORD ENG. DICTIONARY, https://www.oed.com/dictionary/loss_n1?tab=meaning_and_use#38877144 (last visited May 8, 2025); *see Boler*, 115 F.4th at 324–25 ("These multiple and varied definitions alone demonstrate that 'loss' could mean a number of different things depending on the dictionary of one's choice."). Accordingly, "uncertaint[y]" remains following a plain reading of the term "loss." *Kisor*, 588 U.S. at 566.

Nor do the Guidelines' structure or the context in which the term "loss" is used resolve this ambiguity. The relevant conduct Guideline, which guides courts in determining the offense level based on the defendant's conduct, directs

courts to consider "*all harm* that resulted from" the criminal activity. U.S.S.G. § 1B1.3(a)(3) (emphasis added). Read alongside § 2B1.1, § 1B1.3's broad directive, which does not define or limit "harm," adds further ambiguity to the term "loss" and, at the very least, strongly suggests that "loss" is not limited to only that loss which is identifiable and clearly calculable, as the Yafas contend. *See Boler*, 115 F.4th at 325–26.

Section 2B1.1's history and purpose confirm that the term "loss" is "susceptible to more than one reasonable reading." *Kisor*, 588 U.S. at 566. The Guidelines explain that the purpose of estimating "loss" is to assess "the seriousness of the offense and the defendant's relative culpability." U.S.S.G. § 2B1.1, cmt. (background). The Yafas's narrow interpretation would hamstring courts in fulfilling this purpose and prevent them from adequately assessing a defendant's culpability in fraud convictions where actual loss may be difficult to assess. *See Boler*, 115 F.4th at 327. And historically, since the very first manual was published in 1987, the Guidelines commentary has advised courts to use gain as an alternative measure for loss. *See* U.S.S.G. § 2F1.1, cmt. n.8 (1987). Accordingly, because no single meaning of "loss" is evident from § 2B1.1's text, even after employing the traditional tools of interpretation, a genuine ambiguity exists.

## B

Second, Application Note 3(B)'s instruction to use gain is a reasonable interpretation of "loss." An agency's interpretation is reasonable if it "come[s] within the zone of ambiguity the court has identified after employing all its interpretive tools." *Kisor*, 588 U.S. at 575–76. As the foregoing analysis demonstrates, the zone of ambiguity for

the term "loss" stretches, at a minimum, along a spectrum from the actual, calculable loss experienced by victims of an economic crime to the far broader harms involved in and arising out of a defendant's criminal conduct. Application Note 3(B) falls within this range. Because federal theft and fraud statutes can "cover a broad range of conduct," U.S.S.G. § 2B1.1, cmt. (background), relying on the amount of gain enables courts to "maintain[] sufficient flexibility" and issue sentences that "avoid[] unwarranted sentencing disparities among defendants . . . who have been found guilty of similar criminal conduct," even where the actual loss resulting from a defendant's conduct is difficult to calculate, 28 U.S.C. § 991(b)(1)(B).

Further, despite the Yafas's contention to the contrary, Application Note 3(B)'s interpretation does not expand the definition of "loss." *See Banks*, 55 F.4th at 258 (concluding that Application Note 3(A) "expands the definition of 'loss' by explaining that generally 'loss is the greater of actual loss or intended loss'"). Unlike Application Note 3(A)'s instruction that sentencing courts must rely on the loss a defendant *intended* to cause where intended loss is greater than actual loss, Application Note 3(B) merely provides courts with another method to determine the actual loss resulting from a defendant's conduct.[5]

<h2 style="text-align:center">C</h2>

Finally, the character and context of Application Note 3(B) "entitles it to controlling weight." *Kisor*, 588 U.S. at 576. While this inquiry "does not reduce to any exhaustive

---

[5] We note that our conclusion is limited to Application Note 3(B) and says nothing about the reasonableness of Application Note 3(A)'s instruction defining loss as the "greater of actual loss or intended loss."

test," *Kisor* instructs courts to consider whether the interpretation (1) constitutes the agency's "official position, rather than any more ad hoc statement not reflecting the agency's views," (2) implicates the agency's "substantive expertise," and (3) reflects the agency's "fair and considered judgment." *Id.* at 576–79 (internal quotation marks and citations omitted).

The commentary is issued by the Commission as its official position. *Trumbull*, 114 F.4th at 1120. And, given the careful consideration and "ample research" the Commission undertakes and publishes each year in respect to § 2B1.1 crimes, the commentary implicates the Commission's substantive expertise and reflects its fair and considered judgment. *Boler*, 115 F.4th at 328. Further, Application Note 3(B) has been a part of the Guidelines since their inception and does not therefore reflect a "convenient litigating position" or "new interpretation . . . that creates 'unfair surprise' to regulated parties." *Kisor*, 588 U.S. at 579 (citation omitted). Accordingly, the three "especially important markers" identified by the Supreme Court confirm that deference is warranted. *Id.* at 576.

IV

Application Note 3(B)'s interpretation of "loss" warrants deference under *Kisor*. Therefore, the district court did not err when it used the gain that resulted from the Yafas's offenses as an alternative measure for loss.

**AFFIRMED.**